## Case No. 7,584.

### The JUNIATA PATON.

[1 Biss. 15;[1] 1 Am. Law Reg. 262.]

District Court, D. Wisconsin. Dec. 1852.

CARRIER, WHEN RELIEVED FROM DANGERS OF NAVIGATION—BURDEN OF PROOF.

1. Where a bill of lading contains the clause "dangers of navigation excepted," the carrier brings himself within the clause, when he shows that on a dark and stormy night, at the entrance of a harbor difficult of access, he mistook a light on shore in a line with the pier-light, for the latter, whereby the vessel went ashore and damaged a portion of the cargo.

[Cited in The Rocket, Case No. 11.975.]

2. The carrier, in order to avail himself of the benefit of this restrictive clause, must bring his case strictly within the words of the exception, and for this purpose, the burden of proof is upon him.

[Cited in The Rocket, Case No. 11,975.]

3. A master may enter a harbor on a dark night, with a heavy sea and high wind, notwithstanding access be difficult, but not unusually dangerous or difficult, without incurring the imputation of negligence.

In admiralty.

William P. Lynde, for libellant.
Emmons & Van Dyke, for respondent.

MILLER, District Judge. The libellant shipped at the port of Buffalo, on board this vessel, twenty-seven hogsheads and ten barrels of sugar, "to be delivered at the port of Milwaukee, in good order and condition, the dangers of navigation excepted." This vessel belonged at Milwaukee, and the whole cargo, consisting of railroad iron, and other iron, and these sugars, was consigned to that port. The vessel reached the Milwaukee bay, on the western shore of Lake Michigan, about one o'clock at night, in a storm of rain, high wind from the northeast, very heavy sea, and night very dark. The lighthouse light is over one mile and a half from the harbor, at the mouth of the Milwaukee river, where it was usual to have an additional light. After the vessel made the lighthouse light, she stood for the harbor, intending to put in. She made a light which was believed to be the light on the pier, it being in the same range and resembling the pier-light, but it turned out to be a light on shore.

[1 [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

The mistake was not discovered until immediately before the vessel struck. About ninety per cent. of the sugar was lost by the accumulation of water in the hold.

The steamboat Baltic was making for the same light, following close in the wake of the Paton, under the belief that it was the harbor light, and did not discover the mistake until the schooner struck, when she put about and saved herself.

The master of the Paton was, no doubt, from the evidence, competent, and the vessel and crew were in every respect sufficient. It appears, also, that all hands aboard were vigilant and faithful in the discharge of their duties; and that they were at their posts, and that the master once went aloft to satisfy himself of the light.

The owners of schooners employed in the carrying trade upon the lakes are common carriers, and liable as such, unless the loss should occur in an excepted peril. The risks, for which common carriers are liable at common law, include those of all losses, except by the act of God or the common enemy. In the implied, or common law exception of the act of God, the cause of the casualty must be immediate, and stripped of all human means or agency.

The exception in this bill of lading, of the dangers of navigation, is to be understood in a broader sense than to denote natural accidents. It extends to events not attributable to natural causes. It is extended so as to excuse the carrier from losses by collision of two ships, when no blame is imputable to his ship. But there is no doubt the carrier should not be excused, if the loss occurs by a peril which might have been avoided by the exercise of any reasonable skill or diligence. 1 Smith, Lead. Cas. 232–234; Ang. Carr. §§ 167–172; Abb. Shipp. 284–286; Story, Bailm. §§ 510–512; Clark v. Barnwell, 12 How. [53 U. S.] 272. The case of McArthur v. Sears, 21 Wend. 190, is quite similar to this, but the judgment of the court was against the defendant, as he stood chargeable as a common carrier without this exception, or any qualification whatever.

The words forming the exception in this bill of lading are understood in the same sense as in a policy of insurance. The shipper is his own insurer against the dangers of navigation. Where the benefit of an exception is claimed from loss being occasioned by a danger of navigation, it is incumbent on the carrier to bring himself strictly within the terms of the exception. It is by no means unreasonable to require him to prove the loss and the manner of it, and that usual care and diligence had been used to avoid it. This is peculiarly within his own knowledge, or those in his employment and under his control.

The bailor or shipper is left, in a great measure, at the carrier's mercy, from the fact that he has the exclusive custody of the goods, and to convict him of neglect is al-

most impossible. The crew of the vessel are usually the only persons cognizant of the matter, and are not expected to implicate themselves. And the owner can seldom have any other account of his property, or of the facts connected with its loss, than what they may choose to give. For these reasons, testimony from those employed on board, in support of the exemption claimed, must be cautiously considered. But, fortunately for the respondent, the testimony of these witnesses is corroborated in every essential particular by the mate of the steamboat Baltic, and other disinterested witnesses.

It was contended that the vessel should have kept out over night, and should not have attempted entering the harbor during the gale and storm, in the extreme darkness of the night. Some masters of vessels do not come in nights; others do. The Baltic was bound for Milwaukee, and intended coming in that night. The Paton belonged at Milwaukee, and was freighted exclusively for that port. The entrance at the harbor is not unusually dangerous or difficult. The master of this vessel, under these circumstances, was in the discharge of his duty, in coming into port with his vessel and cargo without delay. If he had kept out and the vessel were lost, under the proof of the crew and of the mate of the Baltic, as to their belief, that the light on shore was the harbor light, a liability might attach more readily than in this case.

In making for the harbor, the vessel stood westward, with the light-house light one mile and a half north. The mouth of the harbor is nearly in line north and south with this light. The angle of the vessel's position with this light was not sufficient to have admonished those aboard of their near approach upon the shore. The sea was running high, the vessel before the wind, and the darkness of the night was so intense as to render it impossible for the master on deck, or aloft, to calculate with any degree of certainty the distance to the light on shore.

[It was contended, that even if this vessel should be excused from liability for being thus run ashore, the libel should be sustained by reason of negligence, in not saving the sugar, by taking it out on the succeeding day. On this point twenty-six witnesses were examined, and I am well satisfied that the weight of the evidence is against it. The sea did not abate until the evening of the ensuing day. Men could not pass from the beach to the vessel in a scow; possibly they might in a small boat. The sea was breaking over the vessel, so as to prevent working two of the pumps, or opening the hatches. The vessel was hogged and so injured, that more water was admitted than the three pumps could discharge, even if they all could be worked.

[On mature consideration of the case, I am of opinion that it comes within the exception in the bill of lading, and that the testimony is sufficient to excuse the loss, under the exception, and that the libel should be dismissed. Libel dismissed.] [2]

See The Portsmouth [Case No. 11,295], and 9 Wall. [76 U. S.] 682.